**OSBORN MALEDON**
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Phoenix Plaza
21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-2793

P.O. Box 36379
Phoenix, Arizona 85067-6379

Telephone    602.640.9000
Facsimile    602.640.9050

Colin F. Campbell, No. 004955
Shane Ham, No. 027753
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
ccampbell@omlaw.com
sham@omlaw.com

Francis J. Slavin, 002972
Daniel J. Slavin, 024780
FRANCIS J. SLAVIN, P.C.
2198 East Camelback Road, Ste. 285
Phoenix, Arizona 85016
(602) 381-8700

*Attorneys for Curis Resources (Arizona) Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **Curis Resources (Arizona) Inc.**, an Arizona corporation<br><br>         Plaintiff,<br><br>vs.<br><br>**Town of Florence**, an Arizona municipal corporation<br><br>         Defendant. | No. 2:12-cv-02215-JAT<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND REQUEST TO CONSOLIDATE TRIAL ON THE MERITS WITH PRELIMINARY INJUNCTION HEARING** |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Curis Resources (Arizona) Inc. ("Curis") respectfully submits this Motion for a Preliminary Injunction (the "Motion") to enjoin Defendant Town of Florence ("the Town") from enforcing Ordinance 583-12 passed on August 6, 2012, and to consolidate the hearing on the preliminary injunction with a bench trial on the merits of this case for a permanent injunction.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

This action arises out of the Town's enactment of a criminal ordinance which deprives Curis of the rights, privileges, and immunities secured to it by the United States Constitution and the Arizona Constitution.

### **BACKGROUND FACTS: FLORENCE COPPER PROJECT**

As set forth in the Verified Complaint, Curis owns land within the Town municipal boundaries as well as a mineral lease for adjacent State of Arizona trust lands. Pursuant to Arizona law, the mineral lease grants Curis a real property interest in the State of Arizona trust lands. *See State v. Superior Court for Maricopa County*, 113 Ariz. 248, 250, P.2d 626, 628 (1976). Curis intends to extract copper pursuant to its property rights, and collectively this copper extraction effort on private and state land is generally known as the Florence Copper Project (the "Project").

From its inception, the Project has existed both on the State of Arizona trust lands and the adjoining land now owned by Curis. The Project was lawfully permitted, developed, and operated in the unincorporated territory of Pinal County by BHP Copper, a previous owner, and was not subject to regulation by Pinal County. Although the Town changed the zoning for the segment of the Project within the municipal boundaries after the development, the Project and its facilities have been in continuous use since the inception of the Project, and therefore the Project may continue under Curis' legal nonconforming use rights pursuant to A.R.S. § 9-462.02(A).

Under BHP's ownership and operation, the Project was permitted by, among others, the Arizona Department of Environmental Quality ("ADEQ") and the U.S. Environmental Protection Agency ("EPA"). The Project is extensively regulated, with no fewer than 19 permits required to authorize copper recovery operations.

The Project involves a process known as in-situ mining. This process involves the injection of a water-based solution containing less than or equal to 1.0% sulfuric acid—approximately the same pH as vinegar—deep into the ground, where it infiltrates naturally occurring fractured bedrock and dissolves copper. The solution is recovered

from a series of recovery wells which ring each injection well and return the solution to the surface. The copper is removed and the solution is recycled. The entire system is closed, and poses virtually no risk of underground solution leakage.

Active copper extraction efforts at the Project are expected to last approximately 20 years. The mineral lease requires mineral extraction to be conducted in conformance with a mining plan of operations which states explicitly that an "in-situ mining leaching method" will be employed.[1] When it acquired the land and the mineral lease, Curis intended to continue under the general provisions of the Mining Plan of Operations, subject to any minor amendments required by permitting agencies. Preparation for in-situ mining operations is already underway, and Curis intends to begin in-situ mining operations immediately upon receipt of the final permit.

## OPPOSITION BY THE TOWN

Certain Town officials and employees have worked to oppose the Project for several years. With the assistance of private business interests, these individuals have made numerous legal maneuvers to prevent mining at the Project, including multiple public statements of opposition; condemnation of the main operations building at the Project headquarters; passage of a nonbinding resolution urging state and federal agencies to deny environmental permits; and filing a lawsuit to block an ADEQ permit.

On August 6, 2012, the Town Council enacted Ordinance 583-12 (the "Ordinance"), which declares "[i]n-situ mining and other businesses which utilize large quantities of sulfuric acid" to be a nuisance and a "nauseous, offensive and unwholesome business."[2] The Ordinance became effective immediately upon passage pursuant to an emergency clause, and applies not only within the municipal boundaries of the Town, but also to any land within two miles of the Town municipal boundaries pursuant to A.R.S. § 9-240(B)(21)(c). Although the state trust land is not within the

---

[1] Doc. 1-3 at 7. All page numbers for filed documents refer to the numbers appended by the ECF system at the top of each page.
[2] Doc. 1-4 at 5.

municipal boundaries, this two-mile bubble around the Town encompasses the state trust land portion of the Project.

Violation of the Ordinance is a class 1 misdemeanor, with each day of operation chargeable as a separate offense.[3] The Ordinance defines "large quantities" of sulfuric acid as "more than 50 gallons used or stored within any 30 day period."[4] The Ordinance does not cite, and the Town Council did not consider, any valid scientific or medical studies justifying the 50-gallon threshold or the 30-day period. Nor does it take into account the safety measures maintained by Curis or the permitting of mining by numerous agencies charged to protect the health and safety of the public such as the ADEQ and the EPA.

### SULFURIC ACID NOT A NUISANCE OR SERIOUS HEALTH RISK

The Ordinance does not define the term "sulfuric acid" and does not specify either a molarity or a concentration level necessary for a substance to qualify as sulfuric acid under the Ordinance. Instead, the Ordinance sets forth the risks associated with sulfuric acid based on informal and anecdotal documents downloaded from the Internet. The preamble to the Ordinance lists a variety of public health and safety concerns raised by sulfuric acid, including groundwater contamination, fire and explosion hazard, inhalation hazard, and risk of osmotic diarrhea. Many of the health and safety concerns raised by the Ordinance, however, also apply to other commonly used chemicals, such as gasoline. Moreover, the key factor in acid is its strength, not volume; one drop of sulfuric acid in a 50-gallon drum of fresh water poses no health hazard whatsoever, yet would potentially qualify as a crime under this Ordinance.

Historically and at common law, neither in-situ mining conducted subsequent to an extensive permitting process nor possession of sulfuric acid is considered a nuisance. In fact, sulfuric acid is used pervasively as an industrial and household chemical.

---

[3] *Id.*

[4] *Id.* at 4.

Further, the Ordinance exempts "agricultural operations" from the criminal prohibition on the use of sulfuric acid. Agricultural operations store large quantities of sulfuric acid, and mix the acid into irrigation water, which in turn is allowed to flow upon and percolate into the ground.

In sum, both the text of the Ordinance and its legislative history indicate that the true purpose behind the Ordinance is not the protection of public health and safety, but to prevent Curis from moving forward with the Project. Curis has already expended millions of dollars in acquiring the Project and in preparation for in-situ mining, and continues to invest money and effort into preparing the site for mining operations. Judicial intervention is therefore necessary to prevent initiation of a criminal prosecution by the Town, the threat of which is currently interfering with Curis' ability to exercise its property rights.

## **ARGUMENT**

The Court should issue a permanent injunction because Curis has satisfied the traditional test for injunctive relief: 1) likelihood of success on the merits; 2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; 3) that the balance of hardships tips sharply in the moving party's favor; and 4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

It is apparent from the text of the Ordinance and its legislative history that the purpose of the Ordinance is to prevent Curis from moving forward with the Project. If this Court does not grant the relief requested, Curis will suffer irreparable harm. The Court should accordingly consolidate the preliminary injunction hearing with a trial on the merits and award permanent injunctive relief to prevent this harm from occurring.

I.   **SERIOUS QUESTIONS EXIST RELATING TO THE MERITS OF CURIS' CLAIMS**

    A.   **The Town Violated the Equal Protection Clause and Arizona Special Law Clause by Intentionally Singling Out Curis For Discriminatory Treatment**

By passing the Ordinance, the Town intentionally singled out Curis from other businesses which are similarly situated in violation of the Equal Protection Clause of the U.S. Constitution and the Special Law Clause of the Arizona Constitution.

          **1.   The Ordinance Violates the Equal Protection Clause**

A government action violates the Equal Protection Clause if it creates a "class of one" that has been (1) intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In *Olech*, a homeowner sued under a "class of one" theory of equal protection, arguing that it was "irrational and wholly arbitrary" for the Village to require a 33-foot easement to connect to the municipal water supply when other homeowners were only required to grant a 15-foot easement. 528 U.S. at 563. The Court, emphasizing that the Equal Protection Doctrine protects individuals rather than groups, held that the suit could go forward. *Id*. at 565.

The Ninth Circuit has applied the class of one theory in the regulatory land-use context, holding that there is no rational basis for state action that is "malicious, irrational or plainly arbitrary." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), overruled on other grounds by *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025 (9th Cir. 2007); *see also Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir.2006) (applying class of one theory to city's denial of billboard permits). In *Squaw Valley*, the court recognized that government conduct was "merely a pretext" for unlawful differential treatment in violation of the Equal Protection Clause if (1) a defendant's asserted rational basis was objectively false, *or* (2) the defendant actually acted based on an improper motive. 375 F.3d 936, 945-46.

In this case, both factors of the *Olech* test are satisfied. First, there is no doubt that the Ordinance intentionally treats Curis differently from others similarly situated and is aimed at a class of one: Curis. Five of the "whereas" clauses in the preamble to the Ordinance applied exclusively to Curis and the Project. No other "whereas" clauses applied exclusively to a single company.

Moreover, the legislative history of the Ordinance, along with the numerous actions taken by the Town to destroy the Project, demonstrate an improper motive to isolate one private company, interfere with property rights, and drive the company out of town. In fact, Councilman Montaño stated on the record that the Ordinance was directed solely at Curis and motivated by bias against Curis:

> The second thing I looked at is I see this ordinance is directed directly towards Curis. It should have been put out there for the protection only of the people. It doesn't make a difference if it was for the in-situ mine or any other establishments. I think this was directed biasly [sic] towards Curis Mine.[5]

Following Councilman Montaño's comments, the Town Council debated an amendment removing the word "Curis" from the Ordinance. During that debate, Town Mayor Tom Rankin specifically sought assurances from the town attorney that the Ordinance would still apply to Curis.[6] The Council eventually passed the Ordinance with an amendment removing the word "Curis" from the preamble, but the amendment merely rendered the language of the Ordinance grammatically and syntactically absurd; the references to the Project remain unmistakable in the text of the Ordinance as amended. As the foregoing facts establish, the Town acted maliciously, irrationally, and arbitrarily in passing this Ordinance aimed solely at preventing Curis from exercising its right to legal mining operations in violation of the Equal Protection Clause.

---

[5] Doc. 1-5 at 21:17-23.

[6] *Id*. at 24:4-8.

Second, the Town's proffered rational basis for the Ordinance is both objectively false and a pretext for the improper motive of discriminating against Curis. The Town argues that numerous health risks warrant the passage of the Ordinance. However, if the Town was truly worried about leaks, fires, or health hazards caused by releasing sulfuric acid into the environment, the rational action would be to ban its use in agricultural fertilizers and water treatments as well. Farmers in and adjacent to the Town spray sulfuric acid into the air, onto the ground, and into water on a regular basis. The fact that the Town does not consider this agricultural use to be a hazard demonstrates that the Town intended to unfairly and unconstitutionally violate the rights of a single entity: Curis.

### 2. The Ordinance Violates Arizona's Prohibition Against the Enactment of "Special Laws"

The Arizona Constitution prohibits the enactment of "special laws." Ariz. Const. art. IV, pt. 2, § 19. Local or special laws are laws that are plainly intended to apply to an arbitrarily targeted individual or group. *State v. Christi*, 149 Ariz. 323, 324, 718 P.2d 487, 488 (App. 1986); *see also Town of Gilbert v. Maricopa County*, 213 Ariz. 241, 246 ¶ 13, 141 P.3d 416, 421 (App. 2006) ("A special law applies only to certain members of a class or to an arbitrarily defined class which is not rationally related to a legitimate legislative purpose."). In order to withstand a challenge as special legislation, a law must meet each of the following criteria: "(1) the classification is rationally related to a legitimate governmental objective, (2) the classification is legitimate, encompassing all members of the relevant class, and (3) the class is elastic, allowing members to move in and out of it." *Town of Gilbert*, 213 Ariz. at 246 ¶ 14, 141 P.3d at 421. The test is conjunctive, so all three prongs must be satisfied or else the law will be struck down as a special law. *City of Tucson v. Woods*, 191 Ariz. 523, 529-30, 959 P.2d 394, 400-01 (App.1997).

Here, the Ordinance was drafted as a special law directed toward Curis. It was drafted exclusively with the intention of prohibiting Curis from conducting in-situ

mining on its property. As discussed above, the exclusion of agricultural operations (which permits farmers to perpetuate the alleged health and safety violations without punishment) is arbitrary and not rationally related to a legitimate legislative purpose. Secondly, the Ordinance does not encompass all members of the classification "businesses which utilize large quantities of sulfuric acid" because it arbitrarily exempts all agricultural operations. Lastly, the Ordinance is not elastic because Curis cannot be excluded from its scope, given that its contract with the State requires it to engage in in-situ mining. *See City of Tucson v. Grezaffi*, 200 Ariz. 130, 138 ¶ 22, 23 P.3d 675, 683 (App. 2001) (elasticity refers not only to whether other entities can be included within the class, but also to whether it "enable[s] others to exit the statute's coverage when they no longer have those characteristics").

In sum, the illegitimate application of criminal penalties to Curis, the arbitrary exemption of agricultural operations which use large quantities of sulfuric acid from criminal penalties, and the failure to enact a general law, make the Ordinance a special law which violates the Arizona Constitution.

      **B.**    **The Town's Actions Unlawfully Impair a Contract Between Curis and the State of Arizona**

The Town's criminalization of in-situ copper mining impairs the contractual obligations between Curis and the State, in violation of the United States and Arizona Constitutions. U.S. Const. art. I, § 10, cl. 1; Ariz. Const. art. 2, § 25. Both the federal and Arizona courts utilize a three-part test to determine whether legislation impairs the obligation of contract: (1) Does the legislation operate as a substantial impairment of a contractual relationship? (2) Can the State identify a significant and legitimate public purpose to justify the legislation? (3) If a legitimate public purpose is established, is the adjustment of the contractual relationship reasonable and appropriate to the public purpose justifying adoption of the law? *See Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 410 (1983); *Phelps Dodge Corp. v. Arizona Elec. Power Co-op, Inc.*, 207 Ariz. 95, 119 ¶101, 83 P.3d 573, 597 (App. 2004).

1    The Ordinance substantially impairs the contractual relationship between Curis
and the State of Arizona. A substantial impairment does not require total destruction of
contractual expectations. *Energy Reserves Group*, 459 U.S. at 411. Rather, a
substantial impairment occurs when a legislative enactment "deprives a private party of
an important right, thwarts performance of an essential term, defeats the expectations of
the parties, or alters a financial term." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d
885, 890 (9th Cir. 2003) (internal citations omitted).

    Here, the mineral lease for the state trust lands incorporates a contract between
Curis and the State of Arizona obligating Curis to pay rent plus royalties to the State of
Arizona in exchange for rights to the minerals under the land.[7] The Ordinance impairs
that contract because the applicable Mining Plan of Operations submitted pursuant to
the mineral lease obligates Curis to extract the minerals using the in-situ mining
process.[8]  The Ordinance, however, makes it a crime for Curis to conduct in-situ
mining, thereby denying Curis the benefit of the contractual right to extract copper and
denying the State of the benefit of royalty payments. *See Horwitz-Matthews, Inc. v.
City of Chicago*, 78 F.3d 1248, 1250–51 (7th Cir. 1996) (plaintiff would have a valid
Contracts Clause claim if the state passed a law "forbidding the City . . . to sell land for
redevelopment" because the "City would be off the hook," and plaintiff's "contractual
remedy would be extinguished by the effect of the state statute").

    The denial of the benefits of the mineral lease contract is "substantial" as the
Ordinance perpetrates a massive negative economic impact on both Curis and the State,
and interferes with the investment-based expectations of Curis when the property was
acquired. *See Southern California Gas Co.,* 336 F.3d at 890. As a criminal ordinance
imposing penalties of up to six months imprisonment for every day the in-situ mine is in
production, the Ordinance results in a total frustration of purpose of the mineral lease

---

[7] Doc. 1-2 at 5-8.

[8] Doc. 1-3 at 7.

and the legal prior nonconforming use on the state trust land portion of the Project. By reason of the Ordinance, Curis cannot conduct in-situ mining as it is entitled to do under its contract with the State of Arizona; nor can Curis pay royalties to the State as it is obligated to do under the contract.

No significant and legitimate public purpose justifies the Town's enactment of the Ordinance. If a regulation constitutes a substantial impairment, "the [Town], in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves Group*, 459 U.S. at 411-12 (internal citations omitted).

In this case, the Town has neither a significant nor a legitimate public purpose that could justify the impairment of contractual obligations. The health and safety justifications for the Ordinance are unsubstantiated, and the Ordinance clearly targets Curis. If the possession of sulfuric acid was actually dangerous, there would not have been a broad exemption for agricultural purposes, where its use is pervasive. Indeed every health and safety risk recited in the Ordinance applies equally to agricultural use of sulfuric acid, if not more so – farmers pour sulfuric directly into irrigation water which in turn is poured directly onto the ground. Fire risks, ingestion risks, and contamination risks all apply to agricultural users, and yet the Town did nothing to regulate agricultural use of sulfuric acid. Even if the Ordinance's health and safety justifications were found to be significant and legitimate, the Ordinance would fail to be reasonably related to that purpose given the general exclusion for agricultural uses described above. Instead, by proposing and enacting the Ordinance, the Town acted under color of law to impair a contract between Curis and the State in violation of Article 1, Section 10 of the United States Constitution and Article 2, Section 25 of the Arizona Constitution.

    **C.**    **The Ordinance is Preempted by Federal and State Law**

With respect to the state land portion of the Project, the Enabling Act and the statute granting complete control over state trust lands to the Arizona State Land

Department preclude the Town from further regulating the project. State trust lands were granted to the State of Arizona under the Arizona-New Mexico Enabling Act of June 20, 1910 ("Enabling Act"). Act of June 20, 1910, ch. 310, 36 Stat. 557. "The full provisions of the Enabling Act became part of the organic law of this state." *Kadish v. Arizona State Land Dept.*, 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987) *aff'd sub nom. ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989). Because federal law is supreme in this field, the trust provisions contained in the Enabling Act cannot be altered without congressional approval. *Id*.

The lands acquired pursuant to the Enabling Act shall be held in trust by the State and can only be disposed of in a manner provided by the Act, and that only the State of Arizona shall prescribe the term of mineral leases. Enabling Act § 28. The Arizona Legislature tasked the State Land Department with "charge and control" of all state trust lands and granted it plenary authority to "administer all laws" relating to state trust lands. A.R.S. § 37-102. An opinion from the Arizona Attorney General, which long predates Curis' acquisition of the mineral lease, affirms this point: "It is inconsistent with this express direction from the Enabling Act and legislature to permit a local jurisdiction to exercise control over the Commissioner's obligation to direct the use of the state trust lands." 1987 Ariz. Op. Atty. Gen. 157.

In granting a mineral lease for the Project which specifically calls for in-situ mining, the State of Arizona approved the use of in-situ mining on the state lands of the Project. Curis knew the State of Arizona had approved in-situ mining at the Project when it acquired the mineral lease, and made the acquisition in reliance on that approval. By banning the mining process already approved by the State of Arizona, the Ordinance is in actual conflict with the Enabling Act and the State's administration of the state trust lands at the Project. Because of the preemptive federal and state enactments, the Town possesses no authority to declare the Project a nuisance and punish Curis with criminal sanctions.

## II.  CURIS WILL SUFFER IRREPARABLE HARM IF THE ORDINANCE IS NOT ENJOINED

Where, as here, the plaintiff's action is intended to prevent the Town from initiating an enforcement action, the prospect of that enforcement action "supplies the necessary irreparable injury." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992). In *Morales*, the Supreme Court held that injunctive relief restraining state attorneys general from enforcing airline advertising regulations was appropriate, when the attorneys general had "made clear" that they would enforce the regulations and state law imposed civil liability and damages for repeated violations. *Id*. at 381. "When enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law." *Id*.

Additionally, in *Am. Trucking Ass'n, Inc. v. City of L.A.*, the Ninth Circuit held that movants demonstrated irreparable injury when they were faced with a "Hobson's choice" of either signing an agreement that was "likely unconstitutional" or suffering such significant business losses that "the result would likely be fatal." 559 F.3d 1046, 1057-58 (9th Cir. 2009). The plaintiffs in that case sought to enjoin the Port of Los Angeles and Port of Long Beach from implementing mandatory concession agreements they believed were preempted by the Federal Aviation Administration Act. *Id*. at 1048. By refusing to sign the likely unconstitutional agreements, the court held that ATA would, at a minimum, lose customer goodwill—a recognized irreparable injury—and more likely, their entire business. *Id*. at 1058. On the other hand, signing the likely unconstitutional agreement also placed the plaintiffs in an equally troubling predicament, forcing them to dramatically alter their business in ways that could not be compensated by money damages alone. *Id*.

In this case, the imminence of criminal prosecution is demonstrated by the Town's passage of the Ordinance with an emergency clause so that the Ordinance

would take effect immediately. Each day Curis operates with sulfuric acid located at the Project site can be charged as a separate offense. Just as in *American Trucking Association*, Curis faces the choice of either violating the criminal Ordinance or suffering severe and irreparable commercial harm as the Ordinance completely destroys the value of the mineral lease, the value of all investment in site acquisition and preparation, and the value of Curis' legal nonconforming use rights. The Ordinance effectively renders Curis' property worthless for its intended use, in-situ mining. *See also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm.").

## III.     THE BALANCE OF EQUITIES FAVORS CURIS

Because the environmental risks cited in the Ordinance are a sham, the Town cannot suffer any harm from an injunction which would outweigh the massive economic harm to Curis from the enforcement of the unconstitutional Ordinance. In determining whether the balance of equities favors the moving party, courts must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). "Economic harm may indeed be a factor in considering the balance of equitable interests." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

In this case, the economic harm to Curis far outweighs the alleged harm to the Town. *See, e.g., Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (concluding that where asserted environmental injury was "not at all probable," economic interest was properly given more weight). Curis has already expended millions of dollars in acquiring the Project and in preparation for in-situ mining operations at the Project, and continues to invest money and effort into preparing the site for mining operations. The Ordinance completely deprives Curis of all economically beneficial use of its property and prevents it from devoting its

"constitutionally protected property interest" to a valid and legitimate use. *Squaw Valley*, 375 F.3d at 949.

The Town's interests, on the other hand, are not harmed by the injunction. As demonstrated above, the health and safety concerns cited in the Ordinance are both untrue for the Project, and in any event, unmitigated by the Ordinance given its exemption for agricultural users of sulfuric acid. The Project had already been initiated, constructed and tested successfully by a previous owner, and was permitted by, among others, the Arizona Department of Environmental Quality ("ADEQ") and the U.S. Environmental Protection Agency ("EPA"). The Project is extensively regulated, with no fewer than 19 permits required to authorize copper recovery operations, 18 of which have already been granted. The balance of the equities thus weighs sharply in favor of granting Curis the preliminary injunction.

## IV. AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST

The public interest would best be served by enjoining enforcement of the Ordinance as unconstitutional. The public interest is violated when the government is permitted "to violate the [plaintiff's] rights to equal protection when there are no adequate remedies to compensate plaintiff[] for the irreparable harm caused by such violation." *Collins v. Brewer*, 727 F. Supp. 2d 797, 814 (D. Ariz. 2010) *aff'd sub nom. Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011). The public interest is also violated when the government is not enjoined from violating the Supremacy Clause by enforcing a preempted statute. *American Trucking Ass'ns*, 559 F.3d at 1059-60. Finally, the U.S. Supreme Court has long recognized that "[n]o community can have any higher public interest than in the faithful performance of contracts and the honest administration of justice." *Edwards v. Kearzey*, 96 U.S. 595, 603 (1877) (discussing Impairment of Contracts Clause of U.S. Constitution).

Meanwhile, the purported health risks to the public are negligible at best. Furthermore, the Ordinance does nothing to mitigate the alleged risks since all agricultural uses are exempted although farmers are still storing acid and pouring it into

the irrigation water. This Ordinance was targeted exclusively and explicitly against Curis. The Town has never had any intention of enforcing it against any other entity besides Curis, and therefore should be enjoined.

### V. THE COURT SHOULD CONSOLIDATE THE HEARING ON THE PRELIMINARY INJUNCTION WITH A BENCH TRIAL ON THE MERITS OF THIS CASE FOR A PERMANENT INJUNCTION

Given the significant interests involved in this case and the fact that Curis has expended substantial resources on the Project, the Court should consolidate the hearing on the preliminary injunction with a bench trial on the merits of this case for a permanent injunction pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. This Court has the discretion to consolidate "by stipulation, motion, or even sua sponte so long as the procedures do not result in prejudice to either party." *Glacier Park Found. v. Watt*, 663 F.2d 882, 886 (9th Cir. 1981); *see generally,* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2950 at 236-39 (1995).

This case involves questions of law where consolidation of the trial and preliminary injunction hearing would avoid unnecessary redundancies at trial. Moreover, Curis seeks the same injunctive relief at the preliminary injunction phase as it will at trial. Because the standard for a preliminary injunction is "essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," *Amoco Production Co.*, 480 U.S. at 546 n.12, consolidation is both appropriate and necessary in order for Curis to confidently and legally move forward with the Project.

### CONCLUSION

For all of the foregoing reasons, this Court should grant the Motion, declare the Ordinance invalid, and enjoin the Town from enforcing the Ordinance.

DATED this 9th day of November, 2012.

OSBORN MALEDON, P.A.

By: s/ Colin Campbell
Colin F. Campbell
Shane M. Ham
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793

FRANCIS J. SLAVIN, P.C.

By: s/ Francis Slavin
Francis J. Slavin, 002972
Daniel J. Slavin, 024780
Francis J. Slavin, P.C.
2198 East Camelback Road, Ste. 285
Phoenix, Arizona 85016

*Attorneys for Curis Resources, (Arizona), Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2012, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Julie Greenwood
4531241v1